FILED

2013 MAR 28 PM 1:50
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2012 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. **CR13-0206** |
| Plaintiff, | **I N D I C T M E N T** |
| v. | [18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 2(b): Causing an Act to be Done] |
| AKINOLA EMMANUEL AFOLABI, | |
| Defendant. | |

The Grand Jury charges:

COUNTS ONE THROUGH FIVE

[18 U.S.C. §§ 1347 and 2(b)]

A.  INTRODUCTORY ALLEGATIONS

1. Between in or about March 2004 and in or about December 2009, defendant AKINOLA EMMANUEL AFOLABI ("AFOLABI") was the owner and operator of Emmanuel Medical Supply, also known as "Emmanuel Medical Inc." ("Emmanuel"), a supplier of durable medical equipment ("DME"), primarily power wheelchairs ("PWCs"), located in Long Beach, California, within the Central District of California.

2.   On or about October 25, 2004, defendant AFOLABI executed and submitted an application to Medicare to obtain a Medicare provider number for Emmanuel.

3.   In or about December 2005, defendant AFOLABI opened a corporate bank account for Emmanuel at Bank of America, account number xxxxxx3262 (the "Emmanuel Bank Account"). Defendant AFOLABI maintained primary control of this account.

4.   On or about July 17, 2006, and again on or about August 4, 2006, defendant AFOLABI executed and submitted an electronic funds transfer agreement ("EFT") to Medicare, requesting that all future reimbursements from Medicare be directly deposited into the Emmanuel Bank Account.

5.   Between on or about June 7, 2006, and on or about September 28, 2009, Emmanuel submitted to Medicare claims totaling approximately $2,668,384, primarily for PWCs and accessories, and Medicare paid Emmanuel approximately $1,490,532 on those claims.

The Medicare Program

At all times relevant to this Indictment:

6.   Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

7.   CMS contracted with private insurance companies to (a) certify DME providers for participation in the Medicare program and monitor their compliance with Medicare standards; (b) process

and pay claims; and (c) perform program safeguard functions, such as identifying and reviewing suspect claims.

8. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each Medicare beneficiary was given a Health Identification Card containing a unique identification number ("HICN").

9. DME companies, physicians, and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

10. To obtain payment from Medicare, a DME company first had to apply for and obtain a provider number. By signing the provider application, the DME company agreed to abide by Medicare rules and regulations, including the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), which, among other things, prohibits the payment of kickbacks or bribes for the referral of Medicare beneficiaries for any item or service for which payment may be made by Medicare.

11. If Medicare approved a DME company's application, Medicare would assign the provider a Medicare provider number, enabling the DME company to submit claims to Medicare for services and supplies provided to Medicare beneficiaries.

12. From in or about October 2006 through the date of this Indictment, Noridian Administrative Services ("Noridian") processed and paid Medicare DME claims in Southern California.

13. To bill Medicare for DME it provided to a beneficiary, a DME provider was required to submit a claim (Form 1500). Medicare required claims to be truthful, complete, and not misleading. In addition, when a claim was submitted, the

provider was required to certify that the services or supplies covered by the claim were medically necessary.

14. Most DME providers, including Emmanuel, submitted their claims electronically pursuant to an agreement with Medicare that they would submit claims that were accurate, complete, and truthful.

15. Medicare required a claim for payment to set forth, among other things, the beneficiary's name and HICN, the type of DME provided to the beneficiary, the date the DME was provided, and the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the DME.

16. Medicare paid DME providers only for DME that was medically necessary to the treatment of a beneficiary's illness or injury, was prescribed by a beneficiary's physician, and was provided in accordance with Medicare regulations and guidelines that governed whether a particular item or service would be paid by Medicare.

B.  THE SCHEME TO DEFRAUD

17. Beginning on or about June 3, 2006, and continuing through in or about December 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendant AFOLABI, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from

Medicare by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C. <u>MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD</u>

18. The fraudulent scheme operated, in substance, as follows:

   a. Defendant AFOLABI obtained Medicare beneficiary information through various means, including "marketers," whom defendant AFOLABI paid to refer Medicare beneficiaries to Emmanuel, for the purpose of using that information to submit, and cause the submission of, false and fraudulent claims to Medicare on behalf of Emmanuel. Many of these beneficiaries lived more than 50 miles from Emmanuel.

   b. Defendant AFOLABI obtained prescriptions for DME, primarily PWCs, purportedly ordered by doctors who were not the primary care physicians for the beneficiaries and who often were unaware that their provider numbers were being used without their authorization to prescribe DME.

   c. Defendant AFOLABI delivered, or caused to be delivered, PWCs, to some of the Medicare beneficiaries, knowing that those beneficiaries could walk, and so did not medically need a PWC. For other beneficiaries, defendant AFOLABI and his co-schemers either failed to deliver any DME or delivered less expensive items, such as scooters, instead of PWCs.

   d. Defendant AFOLABI then created false and fraudulent documentation to support Emmanuel's purported delivery of PWCs to beneficiaries, even though, as defendant AFOLABI well

knew, some of the beneficiaries did not receive any DME or received less-expensive DME than what was documented in the patient files. Defendant AFOLABI also created false and fraudulent documentation that made it appear as though he had delivered DME when, in fact, defendant AFOLABI was out of the country.

  e. Defendant AFOLABI then submitted, and caused the submission of, false and fraudulent claims to Medicare for DME, including PWCs and related accessories, that were purportedly provided by Emmanuel to Medicare beneficiaries, knowing that the beneficiaries did not have a medical need for the PWCs and that some beneficiaries did not receive the DME for which Emmanuel billed Medicare.

  f. As a result of the submission of false and fraudulent claims, Medicare made payments to the Emmanuel Bank Account, which defendant AFOLABI controlled.

  g. Defendant AFOLABI then transferred and disbursed monies from the Emmanuel Bank Account to himself and others, including marketers, and withdraw large amounts of money in cash.

D.  EXECUTIONS OF THE FRAUDULENT SCHEME

  19. On or about the dates set forth below, within the Central District of California and elsewhere, defendant AFOLABI, together with others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully caused to be submitted to Medicare for payment the following false and fraudulent claims purportedly for power wheelchairs and related accessories:

| COUNT | BENEFICIARY | CLAIM NUMBER | DATED CLAIM SUBMITTED | AMOUNT CLAIMED |
|---|---|---|---|---|
| ONE | M.L. | 108135825270000 | 5/12/2008 | $5,865.00 |
| TWO | A.M. | 108190834987000 | 7/01/2008 | $6,169.00 |
| THREE | R.L. | 108343848281000 | 12/03/2008 | $5,605.44 |
| FOUR | H.P. | 109022836331000 | 1/16/2009 | $5,850.44 |

///
///
///

| COUNT | BENEFICIARY | CLAIM NUMBER | DATED CLAIM SUBMITTED | AMOUNT CLAIMED |
|-------|-------------|--------------|-----------------------|----------------|
| FIVE  | J.C.        | 109133811647000 | 5/4/2009           | $4,500.00      |

A TRUE BILL

/S/
_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

[signature]

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD E. ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

CONSUELO WOODHEAD
Assistant United States Attorney
Deputy Chief, Major Frauds Section

BEN SINGER
Deputy Chief, Fraud Section
United States Department of Justice

O. BENTON CURTIS, III
Assistant Chief, Fraud Section
United States Department of Justice

KRISTEN A. WILLIAMS
Assistant United States Attorney
Major Frauds Section

FRED MEDICK
Trial Attorney, Fraud Section
United States Department of Justice